UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-11054-RGS

NETCRACKER TECHNOLOGY CORPORATION

v.

ROBIN LALIBERTÉ

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO DISMISS
AMENDED COMPLAINT

October 30, 2020

STEARNS, D.J.

Defendant Robin Laliberté resigned his employment effective December 31, 2019 at plaintiff Netcracker Technology Corporation (Netcracker) to take a senior executive position at Compax Software Development GmbH (Compax).  In April 0f 2020, Netcracker became aware that one of its largest customers (Customer) intended to cut a software project from its contract with Netcracker's parent company, NEC Corporation (NEC), and shift the account to Compax.  According to Netcracker, its confidential information appeared in Compax's business pitch "in ways that cannot be accidental," First Am. Compl. (FAC) (Dkt. # 14) ¶ 7 – namely, that Laliberté had exploited his knowledge of Netcracker's

proprietary information to enhance the Compax bid.

Netcracker filed suit against Laliberté – first in the Cantonal Property Chamber in Switzerland, which entered stand-still orders pending resolution of the dispute on its merits[1] – then in this court.  By way of the FAC, Netcracker brings the following claims:  breach of contract (Counts I and II); misappropriation of confidential business information (Count III); tortious interference (Count IV); conversion (Count V); unjust enrichment (Count VI); violation of the federal Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836 *et seq.* (Count VII); and violation of the Massachusetts Uniform Trade Secrets Act (MUTSA), Mass. Gen. Laws ch. 93, § 42 *et seq.* (Count VIII).  On October 7, 2020, Laliberté moved to dismiss.

## BACKGROUND

Netcracker designs and sells business support software (BSS) and operations support software (OSS) to telecommunications companies.  FAC ¶ 2.  BSS enables service providers to conduct customer-facing operations, such as revenue and order management.  *Id.* ¶ 34.  The market for these

---

[1] In deciding this motion, the court does not consider allegations made in the Swiss action.  *See* Exs. C-F (Dkt. # 18).  While a court ruling on a motion to dismiss may look to documents the authenticity of which are not disputed and documents that are referenced in the complaint, *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993), these exhibits are not germane to the sufficiency of Netcracker's instant pleadings.

products is competitive, so Netcracker takes precautions to maintain the confidentiality of its programming source code, designs, technical "architecture" (the structure of a software system), research plans, and other business information.  *Id.* ¶ 20.  These precautions include:  confidentiality provisions in employment agreements; separate contracts with employees to protect Netcracker's proprietary information; non-disclosure agreements with customers and other third parties; restrictions on access to information among Netcracker employees; confidentiality stamps on documents; and password-protected networks and databases.  *Id.* ¶ 21.

Laliberté began working for Netcracker on July 30, 2012 as an Account Manager.  *Id.* ¶ 22.  He was promoted to Vice President of Strategic Accounts, then to General Manager – Europe, and later to General Manager – Asia, Pacific, and Middle East.  *Id.* ¶¶ 30-31.  As a condition of his employment, Laliberté signed an Employee/Contractor Proprietary Information, Inventions, Non-Competition, and Non-Solicitation Agreement (PI Agreement), which required him to keep confidential Netcracker's proprietary information and to return all documents in his possession to Netcracker should he leave the company.  *Id.* ¶ 6.

During NEC's pitch of customized BSS and OSS solutions to the Customer, Laliberté dedicated months of his time to due diligence and the

contract negotiations.  *Id.* ¶ 35.  The Customer ultimately signed with NEC, and the BSS project was subcontracted to Netcracker.  *Id.*  Because the Customer, a Japanese company, was in the Asia, Pacific, and Middle East region, Laliberté was responsible as General Manager for "one of Netcracker's largest accounts."  *Id.* ¶ 37.  He devoted more than half of his time to the Customer, serving as "Netcracker's primary liaison" with the Customer between 2018 and his departure on December 31, 2019.  *Id.*

After Laliberté resigned from Netcracker, the Customer requested that Netcracker stop work on the BSS solution because it planned to award the project to Compax, Laliberté's new employer.  *Id.* ¶¶ 4, 40-41.  Compax is an Austria-based software company that, prior to Laliberté's arrival, had never done business in Japan.  *Id.* ¶¶ 4, 41.  Laliberté was one of Compax's presenters in its bid presentation to the Customer.  *Id.* ¶ 43.

Netcracker alleges that Laliberté took advantage of confidential information to which he had access as a senior executive at Netcracker.  The technical solution that Compax proposed to the Customer allegedly contained proprietary information culled from at least two types of Netcracker documents.  *Id.* ¶¶ 42-51.  One set "describ[ed] Netcracker's BSS capabilities in the rating and billing space" (Netcracker Capabilities Presentations), *id.* ¶ 45, and the other consisted of "case studies of [BSS]

solutions that Netcracker designed for various customers around the globe" (Netcracker Case Studies Presentations), *id.* ¶ 48. The former provided "description and diagrams of Netcracker's billing and rating software architecture" and "design for integrating such software with customers' existing programs," along with customer data and proprietary graphics. *Id.* ¶ 45. And the latter included additional customer information and proprietary graphics, as well as "know-how related to the business and technical challenges . . . in building a [BSS] solution" and descriptions of architecture, benefits, and solutions tailored to those customers. *Id.* ¶ 48.

## DISCUSSION

To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "While a complaint attacked by a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal citations omitted).

I.   *Trade Secret Misappropriation*

Counts VII and VIII are trade secret misappropriation causes of action. "To prevail on a claim of misappropriation of trade secrets, a plaintiff must

show:  1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007); *see also Allscripts Healthcare, LLC v. DR/Decision Res., LLC*, 386 F. Supp. 3d 89, 94 (D. Mass. 2019) ("Massachusetts trade secret law is nearly equivalent to the DTSA . . . ."); *Moog, Inc. v. ClearMotion, Inc.*, 2020 WL 6162921, at *7 (D. Mass. Oct. 21, 2020) ("The standards for misappropriation under the DTSA and the Massachusetts statute are substantially similar."). Laliberté challenges each of these elements in turn.

First, Laliberté argues that Netcracker fails to plead the existence of a trade secret because its "non-exhaustive list of general categories of information . . . . fail[s] for being indefinite." Mot. (Dkt. #17) at 6-7. Netcracker counters that the FAC contains the requisite, specific allegations of trade secrets. Opp'n (Dkt. # 21) at 10.[2]

MUTSA defines a "trade secret" as any "information that is not

---

[2] Netcracker also argues that Laliberté "attempts to impose a higher pleading burden on Netcracker than actually required" under the law. Opp'n at 9. But Netcracker's assertion that liberal pleading rules apply is incorrect. MUTSA requires that a plaintiff "alleging trade secrets misappropriation . . . state *with reasonable particularity* the circumstances thereof, including the nature of the trade secrets and the basis for their protection." Mass. Gen. Laws ch. 93, § 42D(b) (emphasis added).

generally known or readily ascertainable to others who might obtain economic advantage from it, and that was the subject of reasonable efforts to protect against it being acquired, disclosed, or used without consent." *Robert Half Int'l, Inc. v. Simon*, 2020 WL 1218988, at *5 n.4 (Mass. Super. Ct. Jan. 29, 2020), citing Mass. Gen. Laws ch. 93, § 42. "In determining what is an adequate description of a trade secret, courts have required specificity, although that specificity is highly fact dependent." *Sutra, Inc. v. Iceland Exp., ehf*, 2008 WL 2705580, at *4 (D. Mass. July 10, 2008) (collecting cases).

Netcracker alleges that Compax's business pitch to the Customer incorporated Netcracker's trade secrets taken from two types of documents: the Netcracker Capabilities Presentations and the Netcracker Case Studies Presentations. Contrary to Compax's argument that "Netcracker does not identify any *trade secrets* in those Netcracker Presentations," Mot. at 8, the court agrees with Netcracker that, for pleading purposes, at least the "description and diagrams of Netcracker's billing and rating software architecture" are fairly construed as trade secrets. FAC ¶ 45.

"[T]he overall design of software can constitute a trade secret." *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 28 (D. Mass. 2004). To sustain such an allegation, "[p]laintiff need only show

that the particular architecture of its program is valuable [and] that it is not a matter of common knowledge or readily duplicated." *Sutra, Inc.*, 2008 WL 2705580, at *4, quoting *Dickerman Assocs., Inc. v. Tiverton Bottled Gas Co.*, 594 F. Supp. 30, 35 (D. Mass. 1984). Netcracker alleges that keeping its technical architecture and software designs confidential is of "existential importance" because the market for BSS products is ultra-competitive. FAC ¶¶ 20-21. For this reason, it performs its own integrations of software in customers' systems rather than relying on third-party companies. *Id.* ¶ 19. Nor are Netcracker's products "readily duplicated," as demonstrated by the fact that "no two Netcracker customers have exactly the same software programs." *Id.* ¶ 16. Netcracker had placed Laliberté on notice of the nature of its trade secrets during his tenure at the company, including the proprietary aspects of the structure of the two BSS products (billing and rating software) described in the Netcracker Capabilities and Case Studies Presentations. This level of specificity is sufficient to survive a motion to dismiss.[3]

---

[3] Neither party cites case law from courts in this jurisdiction in relation to Netcracker's allegations regarding software architecture or design. And the only case that Laliberté cites concerning software architecture is distinguishable. Unlike Netcracker's specific allegations that Laliberté misappropriated the architecture for two BSS solutions as described in specified documents, the plaintiff in *American Registry, LLC v. Hanaw* pled

Laliberté next faults Netcracker for inadequately pleading reasonable steps taken to protect its trade secrets because the FAC identifies only "generic" security measures, while the original complaint conceded that Laliberté transmitted confidential documents using a personal email address.  Mot. at 11-12.  Netcracker responds that Laliberté's arguments raise factual disputes, not pleading deficiencies.  Opp'n at 12.

"[T]here must be affirmative steps [taken] to preserve the secrecy of the information as against the party against whom the misappropriation claim is made."  *Incase Inc.*, 488 F.3d at 53, citing *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 730-731 (1970).  However, courts "do not require the possessor of a trade secret to take heroic measures to preserve its secrecy," only "all proper and reasonable steps to keep it secret."  *USM Corp. v. Marsen Fastener Corp.*, 379 Mass. 90, 101 (1979), quoting *J.T. Healy & Son*, 357 Mass at 738.  This inquiry "depends on the circumstances of each case, considering the nature of the information sought to be protected."  *Id.*

Netcracker pleads that it took a number of measures to protect its proprietary information, including in-house software integration;

_____

only a generic list of categories of trade secrets.  2013 WL 6332971, at *3-4 (M.D. Fla. Dec. 5, 2013).

confidentiality agreements with employees, customers, and other third parties; restricted access to information among employees; confidentiality stamps; and password protections.  FAC ¶¶ 19, 21.  These allegations are sufficient to survive a motion to dismiss.  *See, e.g.*, *Mktg. All., Inc. v. First Am. Ins. Underwriters, Inc.*, 2006 WL 8458338, at *4 (D. Mass. Jan. 25, 2006), citing *J.T. Healy & Son*, 357 Mass. at 738 (finding confidentiality agreements, restrictions on access to information and password-protections were "proper and reasonable steps" to protect secrecy on a motion to dismiss).

Laliberté's rebuttal arguments are unavailing.  Laliberté does not cite – nor can the court locate – any case law supporting the proposition that protective measures are only sufficiently pled if they are tailored to the trade secrets at issue.  *See Optos, Inc. v. Topcon Med. Sys., Inc.*, 777 F. Supp. 2d 217, 240 (D. Mass. 2011) (rejecting argument that security for an "*entire* computer system" was not sufficiently protective, as requiring measures specific to trade secrets would constitute "the type of heroic effort that [plaintiff] is not required to make under Massachusetts law").  Regardless, Netcracker alleges that it took reasonable measures to protect the Capabilities and Case Studies Presentations.  Netcracker only provided these documents, which bore confidentiality stamps, to customers after they

signed a non-disclosure agreement.  FAC ¶¶ 46, 49.  Whether these measures reasonably protected the trade secrets involved is a factual question, not a legal issue to be decided on the pleadings.  *See* Roger M. Milgram, Milgram on Trade Secrets § 1.04 (1993) ("Courts can be expected to be reluctant to find an absence of safeguards as a matter of law.").  In the same vein, even were the court to consider the allegations in Netcracker's original complaint, a policy of permitting employees to use personal devices is not necessarily "fatal to [Netcracker's] trade secret claims."  Mot. at 12.

Finally, Laliberté argues that Netcracker fails to plead that he used improper means to obtain the trade secrets because "nowhere in the FAC does Netcracker allege facts to support that Mr. Laliberté had access to these presentations in the first place, let alone retained them after resigning," and that a complaint cannot survive "such rank speculation."  *Id.* at 13.  But the court agrees with Netcracker that Laliberté "simply ignores numerous allegations undercutting its theory."  Opp'n at 13.

As a matter of law, an individual who breaches a confidentiality agreement in accessing and appropriating trade secrets has used improper means.  *See Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1165 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).  The PI Agreement required Laliberté to

return all materials containing proprietary information to Netcracker upon his separation and to keep that information confidential.  FAC ¶¶ 6, 23-28. Netcracker pleads not only that Laliberté had access to its trade secrets by way of his senior executive status, *id.* ¶¶ 5, 31-33, 35, 37-38, but also that Laliberté retained and used the Capabilities and Case Studies Presentations in violation of the PI Agreement, *id.* ¶ 42 ("Compax's business pitch to the Customer . . . [was] also based upon . . . Netcracker's Proprietary Information found in documents unlawfully and indisputably retained by Laliberté . . . ."); *see also id.* ¶¶ 44-45, 47-48, 50-55.[4]  Less specific allegations have been found to support a reasonable inference that a former employee used confidential information in violation of an agreement not to compete. *See Anaqua, Inc. v. Bullard*, 2014 WL 10542986, at *12 (Mass. Super. Ct. July 24, 2014), *aff'd*, 88 Mass. App. Ct. 1103 (2015) ("[T]he allegation that [defendant] had high-level access to [plaintiff's] future product and sales strategy, coupled with the fact that he apparently now has a high-level

---

[4] Laliberté argues in his reply that Netcracker concedes that the FAC does not allege that Laliberté retained, disclosed, or used the Netcracker Capabilities or Case Studies Presentations.  Reply (Dkt. # 24) at 1.  Laliberté bases this argument on a footnote in Netcracker's opposition, which states in part:  "To the extent that Laliberté's argument is that Netcracker does not plead in the precise words that 'Laliberté retained, disclosed, and or used [Netcracker's documents],' this misses the mark."  Opp'n at 7 n.4.  This footnote is merely a counterargument; to conflate it with a concession of improper pleading is too much of a stretch.

position with [a competitor] . . . is enough to survive a motion to dismiss."). Based on Netcracker's allegations, a reasonable inference can likewise be drawn that Laliberté breached the PI Agreement, and thus resorted to improper means. The court will therefore deny the motion to dismiss as to Counts VII and VIII.

## II. *Preemption under MUTSA*

Counts III through VI raise an issue of first impression concerning the scope of preemption under MUTSA. The statute provides that it "shall supersede any conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret," excluding "contractual remedies" and "civil remedies to the extent that they are not based upon misappropriation of a trade secret." Mass. Gen. Laws ch. 93, § 42F. Laliberté argues that MUTSA preempts Netcracker's claims for misappropriation of confidential business information (Count III), tortious interference (Count IV), conversion (Count V), and unjust enrichment (Count VI) because they "arise from the same set of facts as a claim for trade secret misappropriation." Mot. at 13. Netcracker maintains that "the better approach is that preemption applies only to claims whose resolution depends upon the information in question qualifying as trade secrets." Opp'n at 16.

The parties agree that a Massachusetts state court has yet to pass on

this question.   Mot. at 12, Opp'n at 16; *see also Amgen USA, Inc. v. Karyopharm Therapeutics, Inc.*, 2019 WL 3552515, at *3-4 (Mass. Super. Ct. June 12, 2019) (raising but not deciding whether MUTSA preempted state law claim).   While a federal district court sitting in diversity may seek "to ascertain the rule the state court would most likely follow under the circumstances" when no state court precedent speaks to the issue, *Norton v. McOsker*, 407 F.3d 501, 506 (1st Cir. 2005) (citation omitted), where "the path of state law is sufficiently undeveloped . . . so as to make such prophetic action unwise, [a court] may instead choose to certify such questions to the highest court of the state."   *Showtime Entm't, LLC v. Town of Mendon*, 769 F.3d 61, 79 (1st Cir. 2014).

Under the circumstances, certification of this question may well prove to be the prudent course of action.   However, Supreme Judicial Court Rule 1:03 requires a certifying court not only to set out "the question of law to be answered," but also to provide "a statement of all facts . . . showing fully the nature of the controversy in which the questions arose."   At this early stage, the facts of this case are too undeveloped for the court to determine whether certification would be appropriate.   Consequently, the court will reserve judgment with respect to Counts III through VI until a fuller development of the factual record can inform the decision.

### III.   *Breach of Contract*

In moving to dismiss Counts I and II, Laliberté argues that Netcracker fails to plead two elements of its breach of contract claims.   "Under Massachusetts law, a breach of contract claim requires the plaintiff to show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result."   *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013).

Laliberté does not challenge the first two elements.   Rather, Laliberté disputes that he breached the PI Agreement because "Netcracker fails to plausibly allege that [he] was in possession of, used, or disclosed any of the allegedly 'Proprietary Information.'"   Mot. at 19.   In response, Netcracker refers to allegations in the FAC that Laliberté retained and used documents containing proprietary information as defined by the PI Agreement.   Opp'n at 7.   The court has addressed this issue in evaluating whether Netcracker adequately pled that Laliberté used improper means to obtain its trade secrets.   As explained earlier, the court agrees with Netcracker.

Laliberté also challenges whether Netcracker adequately pled reasonably specific damages because Netcracker "does not connect its purported damage to any alleged disclosure or use of, or alleged failure to

15

return, Proprietary Information." Mot. at 20.  Despite Netcracker's response that Laliberté's conduct caused it to lose millions of dollars, *see* Opp'n at 8, citing FAC ¶¶ 3, 40-42, 55, both parties overlook the Massachusetts rule: "[C]ausation of damages is not an element of breach of contract, as a plaintiff is entitled to at least nominal damages upon proving a breach." *Bos. Prop. Exch. Transfer Co. v. Iantosca*, 720 F.3d 1, 11 (1st Cir. 2013), citing *Nathan v. Tremont Storage Warehouse, Inc.*, 328 Mass. 168, 171 (1951).  Laliberté's argument fails.  However read, the breach of contract claims are adequately pled.

## ORDER

For the foregoing reasons, the court <u>DENIES</u> Laliberté's motion to dismiss the First Amended Complaint.  The court reserves judgment with respect to Counts III through VI pending a decision whether to certify the question of preemption under MUTSA to the Supreme Judicial Court on a more fully developed record.

SO ORDERED.


/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE